# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TONY TOREAL TOWNSEND,

       Petitioner,

           CASE NO. 2:08-CV-15159
  v.                JUDGE MARIANNE O. BATTANI
              MAGISTRATE JUDGE PAUL J. KOMIVES

BARRY D. DAVIS,

       Respondent.[1]

_____/

# REPORT AND RECOMMENDATION

*Table of Contents*

I.   RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.  REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   A.   *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   B.   *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   C.   *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   D.   *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   E.   *Batson Claims (Claims I, VI & VII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      1.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      2.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
         a. Petitioner's Exercise of Peremptory Challenge . . . . . . . . . . . . . . . . . . . . . . . . . 13
         b. Prosecutor's Exercise of Peremptory Challenge . . . . . . . . . . . . . . . . . . . . . . . . 16
   F.   *Extraneous Jury Influence (Claims II & VIII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      1.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      2.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   G.   *Evidentiary Issues (Claims III & V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
      1.   *Limitation on Cross Examination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
         a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
         b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
      2.   *Failure to Produce Res Gestae Witness* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
      3.   *Prior Inconsistent Statements* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
   H.   *Confession Claims (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
      1.   *Factual Background Relating to Petitioner's Confession* . . . . . . . . . . . . . . . . . . . 35
      2.   *Miranda/Voluntariness* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
         a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
         b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      3.   *Limitation on Cross-Examination at Evidentiary Hearing* . . . . . . . . . . . . . . . . . . 40
   I.   *Ineffective Assistance of Counsel (Claims IX & X)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
      1.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

_____

[1]By Order entered this date, Barry D. Davis has been substituted in place of Blaine Lafler as the proper respondent in this action.

        2.      *Trial Counsel* ............................................................ 43
             a.  Failure to Object to Lt. McCallister's Testimony ............................ 43
             b.  Failure to Object to Testimony of Victim's Mother and Photographs ............. 44
             c.  Failure to Investigate, Call Witnesses, and Impeach Thomas .................... 45
             d.  Failure to Object to Prosecutorial Misconduct .............................. 48
        3.      *Appellate Counsel* ...................................................... 49
J.     *Recommendation Regarding Certificate of Appealability* ............................. 50
        1.      *Legal Standard* ........................................................ 50
        2.      *Analysis* .............................................................. 51
K.    *Conclusion* ............................................................... 52
III.       NOTICE TO PARTIES REGARDING OBJECTIONS ........................................ 52

*     *     *     *     *

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.    <u>REPORT</u>:

A.    *Procedural History*

    1.     Petitioner Tony Toreal Townsend is a state prisoner, currently confined at the Newberry Correctional Facility in Newberry, Michigan.

    2.     On July 11, 2003, petitioner was convicted of first degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a), first degree felony murder, MICH. COMP. LAWS § 750.316(1)(b); possession of a firearm by a felon, MICH. COMP. LAWS § 750.224f; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Wayne County Circuit Court. On July 30, 2003, the trial court vacated petitioner's premeditated murder conviction on double jeopardy grounds, and sentenced petitioner to a mandatory term of life imprisonment without parole on the felony murder conviction, a term of 40-60 months' imprisonment on the felon in possession conviction, and a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

    3.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I. THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED THE DEFENDANT/APPELLANT A FAIR TRIAL WHEN IT BARRED THE DEFENSE FROM EXERCISING A PEREMPTORY CHALLENGE OF A PROSPECTIVE JUROR DESPITE THERE BEING NO OBJECTION FROM THE PEOPLE.

II. THE DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT JAILED A TESTIFYING WITNESS AND THEN COMMENTED TO THE NEWS MEDIA THAT THE WITNESS WAS LYING AND SHOULD NOT BE BELIEVED.

III. THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED THE DEFENDANT/APPELLANT A FAIR TRIAL WHEN IT LIMITED THE EXAMINATION OF A KEY WITNESS REGARDING A CRITICAL CONVERSATION AND BY NOT REQUIRING THE PEOPLE TO PRODUCE AN ENDORSED RES GESTAE WITNESS.

IV. THE TRIAL COURT ERRED AND DENIED THE DEFENDANT/APPELLANT A FAIR TRIAL WHEN IT ADMITTED THE PURPORTED STATEMENT OF THE DEFENDANT/APPELLANT DESPITE EVIDENCE THAT THE STATEMENT HAD BEEN COERCED.

V. THE TRIAL COURT ERRED AND DENIED THE DFEENDANT/APPELLANT A FAIR TRIAL WHEN IT ADMITTED AS SUBSTANTIVE EVIDENCE THE PRIOR TESTIMONY OF SEVERAL WITNESSES WHO WERE PRESENT AT COURT AND WHO TESTIFIED.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Townsend*, No. 252371, 2006 WL 287856 (Mich. Ct. App. Feb. 7, 2006) (per curiam).

4. Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan

Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard

order. *See People v. Townsend*, 476 Mich. 858, 718 N.W.2d 348 (2006).

5. Petitioner subsequently filed a motion for relief from judgment in the trial court

pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I. DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS WERE VIOLATED WHERE THE TRIAL COURT IMPROPERLY COMBINED STEPS TWO AND THREE OF THE BATSON INQUIRY, PLACED THE BURDEN OF PERSUASION OF BATSON ON

3

DEFENDANT AND, THEREFORE, IMPROPERLY DENIED DEFENDANT OF HIS RIGHT TO PEREMPTORILY REMOVE JUROR HILL; THUS, REQUIRING REVERSAL.

II.      DEFENDANT'S FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHERE THE TRIAL COURT CLEARLY ERRED IN DETERMINING THAT DEFENDANT HAD FAILED TO MAKE A PRIMA FACIE SHOWING OF DISCRIMINATION IN THE FIRST STEP OF THE BATSON INQUIRY.

III.     DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS WERE VIOLATED WHERE THE TRIAL COURT ERRED IN NOT QUESTIONING JURORS ABOUT THE EFFECT UPON THEM OF PREJUDICIAL, EXTRANEOUS INFORMATION.

IV.     DEFENDANT WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO (A) OBJECT TO THE ADMISSION OF THE PORTION OF OFFICER MCCALISTER'S PRELIMINARY EXAMINATION TRANSCRIPT THAT GAVE IMPROPER OPINION TESTIMONY THAT VIOLATED DEFENDANT'S DUE PROCESS RIGHTS; (B) OBJECT TO THE TESTIMONY OF THE VICTIM'S MOTHER, AND THE VICTIM'S PHOTOGRAPH, AS IRRELEVANT, AND OBJECT TO THE PHOTOGRAPHS AND COCKING OF FIREARMS THAT WERE MORE PREJUDICIAL THAN PROBATIVE; (C) INVESTIGATE AND CALL KEY WITNESSES TO SUPPORT DEFENSE THEORY; (D) PRODUCE IMPORTANT CHARACTER EVIDENCE TO IMPEACH OFFICER THOMAS; (E) OJBECT TO THE NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT, AND; (F) DO ALL THE ABOVE WHICH, WHEN CONSIDERED CUMULATIVELY, PREJUDICED DEFENDANT AND REQUIRES A NEW TRIAL.

V.      DEFENDANT WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE HIS APPELLATE COUNSEL FAILED TO RAISE THE ABOVE ISSUES; THUS, HE HAS ESTABLISHED GOOD CAUSE FOR FAILURE TO PREVIOUSLY RAISE THESE GROUNDS FOR RELIEF.

On July 12, 2007, the trial court denied petitioner's motion for relief from judgment, concluding that

the claims were without merit. The Michigan Court of Appeals and Michigan Supreme Court denied

petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet

the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Townsend*, 482 Mich. 1030, 769 N.W.2d 201 (2008); *People v. Townsend*, No. 280287 (Mich. Ct. App. Apr. 16, 2008).

6.       Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on December 15, 2008.  As grounds for the writ of habeas corpus, he raises the ten claims that he raised in the state courts.

7.       Respondent filed his answer on July 20. 2009.  He contends that petitioner's claims are barred by petitioner's procedural default in the state courts, or without merit.

8.       Petitioner filed a reply to respondent's answer on September 2, 2009.

B.       *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the August 11, 2002, shooting of Detroit Police Officer Scott Stewart, as he was in the process of arresting petitioner's co-defendant and brother-in-law, Kenneth Little.  As briefly described by the court of appeals:

> Defendant's convictions arise out of the fatal shooting of Detroit Police Officer Scott Stewart on the early morning of August 11, 2002. Defendant had attended a party at the home of his sister, Linda Little, and her husband and defendant's codefendant, Kenneth Little, on Corbett Street in Detroit. By the time Stewart and two other officers arrived in response to shots they heard earlier coming from this location, the party had swelled to over one hundred people. Stewart was in the process of arresting Little, when he was fatally shot in the head.

*Townsend*, 2006 WL 287856, at *1, slip op. at 1.

The voluminous evidence adduced at trial was set forth in detail in peititoner's brief in the Michigan Court of Appeals on direct appeal.  *See* Def.-Appellant's Br. on Appeal, in *People v. Townsend*, No. 252371 (Mich. Ct. App.), at 1-28.  More succinctly summarized, the prosecution's evidence broke down into four general categories.  First, several officers testified as to the circumstances leading to their arrival at the scene and actions once they arrived.  Generally, they

testified to arriving at the scene, attempting to arrest or arresting one or more people, and hearing gunshots. Some of the officers were able to describe in more detail the shooting of Officer Stewart, testifying that Stewart was in the process of arresting Little at the time. All of the officers testified that there were a number of people at the scene, and several described the scene as chaotic. None of the officers was able to identify petitioner as the shooter.

The second category of witnesses consisted of various people at the scene at the time of the shooting. These witnesses were, for the most part, petitioner's friends, relatives, or acquaintances. At trial, they generally testified favorably to petitioner. However, they were each impeached with either prior statements to the police or prior testimony given in response to investigative subpoenas, in which they had implicated petitioner as the shooter in various ways. These witnesses generally disavowed their earlier statements, indicating that they had been coerced or fabricated by the police.

The third category of evidence consisted of various forensic testimony. Most notably, clothes recovered from petitioner's home was found to have gunshot residue, and nine millimeter ammunition was recovered from petitioner's home.

Finally, the prosecution presented evidence of petitioner's incriminating statements to the police. Lieutenant Roy McCalister was determined to be an unavailable witness, and the prosecution was permitted to introduce his testimony from the preliminary examination. At the preliminary examination, Lt. McCalister testified that he advised petitioner of his rights, and that petitioner initially denied still being at the scene when the officers arrived to break up the party. Lt. McCalister did not record this statement, because he did not believe it to be the truth. After it became apparent to Lt. McCalister that petitioner would not give an incriminating statement, he allowed petitioner to speak with his fiancé. Officer Michael Carlisle testified that he first met petitioner at about 8:30 a.m. on the morning of the shooting and brought him a sandwich at that time. He conceded that petitioner

had first given an exculpatory statement, but that this statement had not been reduced to writing. Officer Derrick Thomas testified that later in the day he advised petitioner of his rights and took a ten page statement from petitioner, written by Thomas with each page initialed by petitioner. The statement indicated that petitioner saw someone pointing a gun at Little, so he shot once at the person who was pointing the gun at Little. He did not know that Stewart, who was in plain clothes, was a police officer. Thomas testified that petitioner added, in his own handwriting: "I am deeply sorry for what I have done. I didn't know he was an officer of the law. I'm sorry; please forgive me." Public Safety Officer Antonio Trupiano testified that he was working as a detention officer at the jail, and that petitioner indicated to Trupiano that he was sorry and didn't know that Stewart was a police officer.

Petitioner testified on his own behalf. He denied making the statement to the police, and claimed to have signed it only because he was told he would be able to go home if he did so. He denied any involvement in the shooting death of Stewart, and claimed that his words of remorse were merely an expression that he was sorry that an officer had been killed, not that he was the killer.

C.      *Procedural Default*

Respondent first contends that petitioner's sixth through tenth claims are barred by petitioner's procedural default in the state courts, because petitioner failed to raise these claims on direct appeal. The Court should decline to resolve these claims on the basis of a procedural default.

Here, petitioner first presented his purportedly defaulted habeas claims in his motion for relief from judgment. Michigan Court Rule 6.508, governing motions for relief from judgment, provides that the movant "bears the burden of establishing entitlement to relief." MICH. CT. R. 6.508(D). The rule goes on to provide, in three separately numbered paragraphs, procedural situations in which relief will not be granted: (1) where an appeal relating to the conviction is pending; (2) where the claim has

already been ruled upon in a prior appeal or postconviction motion; and (3) where the claim could have been raised in a prior appeal or postconviction motion but was not. *See* MICH. CT. R. 6.508(D)(1)-(3). Although the trial court rejected the claims on the merits, the Michigan Court of Appeals and the Michigan Supreme Court both rejected petitioner's appeal based on his "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." The Sixth Circuit has conflicting decisions regarding the sufficiency of this language to invoke the procedural bar in Rule 6.508(D)(3) and constitute a procedural default in federal court. *Compare Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir. 2000) (language alone sufficient to constitute invocation of procedural bar), *with Abela v. Martin*, 380 F.3d 915, 923-24 (6th Cir. 2004) (language insufficient where lower court opinion rejected claims on the merits). The Sixth Circuit has recently granted rehearing *en banc* to resolve this issue. *See Guilmette v. Howes*, No. 08-2256 (6th Cir. Mar. 12, 2010).

While the procedural default doctrine precludes habeas relief on a defaulted claim, the procedural default doctrine is not jurisdictional. *See Trest v. Cain*, 522 U.S. 87, 89 (1997). Thus, while the procedural default issue should ordinarily be resolved first, "judicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted); *see also*, *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis because resolution of the default issue would require remand and further judicial proceedings); *Walter v. Maass*, 45 F.3d 1355, 1360 n.6 (9th Cir. 1995). In light of the difficult questions discussed above, the procedural default analysis is significantly more complicated than the analysis of petitioner's substantive claims for relief, and the Court should therefore proceed to the merits of petitioner's claims. Indeed, the Sixth Circuit itself has taken this approach. *See Roush*

*v. Burt*, 313 Fed. Appx. 754, 757-58 (6th Cir. 2008) (noting the Sixth Circuit's conflicting decisions and the rule that procedural default is not jurisdictional, and concluding "because we affirm the district court's decision on the merits, we leave issues regarding procedural default and the generic use of MCR 6.508(D) for another day.").

Further, even were the Court to conclude that petitioner's claims are procedurally defaulted, it is still necessary to consider the claims on the merits. As noted above, petitioner can still have his defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that his appellate counsel was ineffective for failing to raise these claims on direct appeal. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst

other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.      *Batson* Claims (Claims I, VI & VII)

Petitioner first raises several challenges to the trial court's handling of peremptory challenges during jury selection. In his first and sixth claims, petitioner contends that the trial court improperly precluded him from exercising a peremptory challenge, and in his seventh claim he contends that the prosecutor improperly exercised a peremptory challenge on the basis of race. The Court should

conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Court held that "[a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race[.]" *Batson*, 476 U.S. at 89 (citation and internal quotation omitted).  Although *Batson* was decided in the context of a prosecutor's use of peremptory challenges based on race, *Batson* has been extended to prohibit gender-based peremptory challenges, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), as well as to challenges by criminal defendants, *Georgia v. McCollum*, 505 U.S. 42 (1992), and by parties in civil cases, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991).  In evaluating *Batson* claims, a court must follow a three-step process:

> First, the [the objecting party] must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.  Second, if the requisite showing has been made, the burden shifts to the [opposing party] to articulate a race-neutral explanation for striking the jurors in question.  Finally, the trial court must determine whether the [objecting party] has carried his burden of proving purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358-59 (1991) (plurality opinion) (citations omitted) (citing *Batson*, 476 U.S. at 96-98); *see also*, *Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008); *Rice v. Collins*, 546 U.S. 333, 338 (2006); *Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003) ("*Miller-El I*").  With  respect to the first prong, a *prima facie* showing requires the objecting party to show that the opposing party exercised a peremptory challenge against a member of a cognizable racial group, and that the relevant circumstances raise an inference that the party removed the potential juror because of his or her race.  *See Batson*, 476 U.S. at 96-97.

Further, as pre-AEDPA decisions have noted, "[t]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact that is entitled to 'great deference on appeal.'" *Kelly v. Withrow*, 25 F.3d 363, 367 (6th Cir. 1994) (quoting *Hernandez*, 500 U.S. at 364); *see also*, *Snyder*, 552 U.S. at 477.  Thus, under the AEDPA, a state court's determination that a prosecutor's use of peremptory challenges was not motivated by discrimination will be upheld, and a petitioner will not be entitled to habeas relief, unless it can be said that the state court's decision amounted to an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding,"   28 U.S.C. § 2254(d)(2), and the trial court's factual findings regarding discriminatory intent are presumed correct unless rebutted by clear and convincing evidence, 28 U.S.C. § 2254(e).  *See Rice*, 546 U.S. at 338-39; *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ("*Miller-El II*").

> 2.    *Analysis*

> *a. Petitioner's Exercise of Peremptory Challenge*

In his first and sixth claims, petitioner challenges the trial court's failure to allow him to exercise a peremptory challenge to excuse a juror.  The factual circumstances surrounding these claims was summarized by the Michigan Court of Appeals:

> On the second day of jury selection, prospective juror Hill, a Caucasian male, informed the court that his son was an attorney who had recently passed the New Mexico bar examination. Hill indicated that his son did not have employment yet and was uncertain whether he was going to be a public defender or an assistant prosecutor. Hill represented that this son's occupation would not affect his participation in the trial. Shortly thereafter, defendant, an African-American male, attempted to use a peremptory challenge on Hill. The prosecutor asked to approach the bench, and the parties had an off-the-record discussion with the trial court. The court then went back on the record and declared a jury, which included Hill. The jury was excused and defendant was then allowed to note his objection for the record. Defendant indicated Hill had been employed for twenty-five years as a supervisor and had a son who may become employed as a public defender or a prosecutor. Defendant stated that there were "all kinds of reasons that has nothing to do with this man's race, why we want

13

to excuse him." Defendant confirmed that, based on the prosecution's objection, the trial court had determined that defendant's challenge was based on race and disallowed it. The court noted that defendant's challenges were mostly used to exclude white males.

*Townsend*, 2006 WL 287856, at *1, slip op. at 2; *see also*, Trial Tr., Vol. II, at 38-48. In his first claim, petitioner contends that the trial court improperly applied *Batson* as a substantive matter and erred in refusing to allow him to peremptorily challenge Hill. In his sixth claim, petitioner contends that the trial court improperly applied *Batson* as a procedural matter by collapsing steps two and three of the *Batson* inquiry and by placing the burden of proof on him to justify his use of a peremptory challenge to strike Hill.

Petitioner's challenges are foreclosed by the Supreme Court's decision in *Rivera v. Illinois*, 129 S. Ct. 1446 (2009). In that case, the defendant challenged as erroneous the state trial court's denial of his exercise of a peremptory challenge based on the trial court's finding that the peremptory challenge was exercised on the basis of the juror's race, in violation of *Batson*. The Court concluded that so long as the jury actually seated was fair and impartial, the erroneous application of *Batson* to deny a defendant's exercise of a peremptory challenge does not raise a constitutional claim. The Court began by explaining that it "has consistently held that there is no freestanding constitutional right to peremptory challenges." *Rivera*, 129 S. Ct. at 1453. Rather, peremptory challenges are a creature of state law that the states are free to grant or withhold, and "[w]hen states provide peremptory challenges . . . they confer a benefit beyond the minimum requirements of a fair jury selection." *Id*. (internal quotation omitted). For this reason, "the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution." *Id*. at 1454. This conclusion forecloses petitioner's claim here.

Petitioner does not contend, and the record does not suggest, "that the trial judge repeatedly

or deliberately misapplied the law or acted in an arbitrary or irrational manner," so as to raise the specter of a due process violation. *Id*. at 1455. Rather, "the trial judge's conduct reflected a good-faith, if arguably overzealous, effort to enforce the antidiscrimination requirements of [the Supreme Court's] *Batson*-related precedents." *Id*. As such, the trial court's action in preventing petitioner from exercising a peremptory challenge to excuse Hill did not deprive petitioner of due process. *See id*. Further, petitioner does not contend, and the record does not suggest, that Hill was actually biased or impartial. Thus, petitioner's "jury was impartial for Sixth Amendment purposes." *Id*. at 1454. Regardless of whether the trial court correctly applied *Batson* or correctly applied state law relating to peremptory challenges, petitioner "received precisely what due process required: a fair trial before an impartial and properly instructed jury, which found him guilty of every element of the charged offense." *Id*. at 1456. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Prosecutor's Exercise of Peremptory Challenge

Petitioner's second *Batson* claim relates to the trial court's failure to sustain his challenge to the prosecutor's exercise of a peremptory challenge. After the first day of jury selection, the parties had a conference at which defense counsel objected to the prosecutor's exercise of peremptory challenges. The following day, the trial court permitted counsel to make a record of his objection, and denied the objection, reasoning:

> All right. Now, I looked at the challenges that were made by both sides. And I think that the Prosecutor excused as many white jurors as black jurors. And I noticed that the Defense excused a large number of black jurors. . . .
>
> . . . . And both sides, I mean, you excused some white jurors, you excused some black jurors; she did the same thing. I don't think any right have [sic] been violated; I've detected no pattern of an attempt to exclude persons because of their race.
>
> It happens, but I don't think that there's a pattern to show that there was any discrimination, Mr. Winters.

Trial Tr., Vol. II, at 5. Counsel made a further record after the jury selection was complete, contending that the prosecutor had exercised eight peremptory challenges against black venire members and only three against white venire members. With respect to the prosecutor's twelfth peremptory counsel could not recall the race of the venire member. *See id*. at 49.

As noted above, the trial court's finding that the circumstances did not raise an inference of discriminatory intent is entitled to a presumption of correctness unless rebutted by clear and convincing evidence. *See Rivers v. Quarterman*, 661 F. Supp. 2d 675, 700 (S.D. Tex. 2009). Here, petitioner does not present any clear and convincing evidence to rebut the trial court's factual finding at step one of the *Batson* inquiry. Rather, petitioner notes only that the prosecutor excused eight jurors who were black. However, petitioner does not point to anything in the record, apart from the bare race of the jurors, that the prosecutor was motivated by a discriminatory intent. On the contrary, the fact that the prosecutor also excused a number of white jurors suggests that such an intent was not present. And, although it is not entirely clear, it appears that the prosecutor used peremptory challenges against white venire members despite there being additional black venire members who could have been stricken. In any event, the mere fact that the prosecutor excused some black jurors does not alone establish an inference of discrimination, much less provide clear and convincing evidence that the trial court's conclusion was erroneous, in the absence of any other indicia of discriminatory intent such as questioning of jurors relating to race or the exercise of all peremptory challenges against black venire members. *See Williams v. Cain*, 359 Fed. Appx. 462, 465-66 (5th Cir. 2009); *Central Alabama Fair Housing Ctr., Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 638 (11th Cir. 2000) ("the unchallenged presence of jurors of a particular race on a jury substantially weakens the basis for a prima facie case of discrimination in the peremptory striking of jurors of that race."); *United States v. Griffin*, 194 F.3d 808, 826 (7th Cir. 1999) ("[T]he fact that the [g]overnment did not

challenge the other black juror further weakens the argument that the government's strikes were based on a motive to discriminate."); *United States v. Bergodere*, 40 F.3d 512, 516 (1st Cir. 1994) (internal quotation omitted) ("A defendant who advances a *Batson* argument ordinarily should come forward with facts, not just numbers alone."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Extraneous Jury Influence (Claims II & VIII)*

In his second and eighth claims, petitioner contends that he was denied a fair trial because the jury was exposed to the judge's comments, made outside the jury's presence, that one of the witnesses had committed perjury. Claim II appears to raise a substantive claim that petitioner was denied a fair trial by the judge's comments, which were reported in a newspaper the following day, while Claim VIII asserts that the trial court erred in failing to hold a hearing to inquire into whether the jurors had seen the article. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment guarantees a criminal defendant the right to a trial by an impartial jury. *See Duncan v. Louisiana*, 391 U.S. 145, 147-49 (1968). Thus, a defendant is entitled to a have a panel of impartial, "indifferent" jurors. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961). In *Remmer v. United States*, 347 U.S. 227 (1954), the Court held:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Remmer*, 347 U.S. at 229. Although *Remmer* spoke of a "presumption of prejudice," the Court has

subsequently indicated that a defendant alleging improper juror contact must demonstrate actual prejudice. In *Smith v. Phillips*, 455 U.S. 209 (1982), the Court cited *Remmer* in stating that "[t]his Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove bias." *Smith*, 455 U.S. at 215. As the Court explained:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . . [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Smith*, 455 U.S. at 217. In light of *Smith*, the presumed prejudice language of *Remmer* is no longer good law; all that is required is a hearing at which the defendant is given the opportunity to establish that the improper contact caused actual prejudice. *See United States v. Pennell*, 737 F.2d 521, 532-33 (6th Cir. 1984); *see also*, *United States v. Olano*, 507 U.S. 725, 739 (1993) (whether viewed as a presumed prejudice test or a case-by-case determination, question in all cases is "did the intrusion affect the jury's deliberations and thereby its verdict."); *United States v. Corrado*, 304 F.3d 593, 603 (6th Cir. 2002). Petitioner contends that counsel should have requested such a hearing.

Further, the presumed prejudice standard is inapplicable, at least on habeas review, in cases involving media exposure as opposed to third party contact. As the Eighth Circuit has explained, although some courts of appeals "have extended the *Remmer* presumption to claims alleging juror exposure to extraneous information, including claims of mid-trial exposure," the majority of circuits "have confined the application of *Remmer* to cases alleging third-party contact with jurors." *Tunstall v. Hopkins*, 306 F.3d 601, 610-11 (8th Cir. 2002); *see United States v. Lloyd*, 269 F.3d 228, 239 (3d Cir. 2001); *United States v. Williams-Davis*, 90 F.3d 490, 501-02 (D.C. Cir. 1996); *United States v. Dutkel*, 192 F.3d 893, 894-95 n.1 (9th Cir. 1999). In light of this disagreement between the courts of

appeals, and in the absence of any directive from the Supreme Court on the matter, no clearly established federal law as defined by § 2254(d)(1) requires a state court to apply a presumption of prejudice to mid-trial media exposure. *See Tunstall*, 306 F.3d at 611. Thus, to be entitled to relief on this claim petitioner must show both that the jury was exposed to a media report, and that the report was prejudicial. *See Williams-Davis*, 90 F.3d at 501 (discussing *Waldorf v. Shuta*, 3 F.3d 705, 710 (3d Cir. 1993)).

    2.    *Analysis*

As noted in the factual background section, *supra*, a number of the prosecution's witnesses testified favorably to petitioner at trial, although they had previously given statements to the police or testified in response to investigative subpoenas in ways which implicated petitioner. During her time on the stand, witness Shantell Foster gave testimony which either contradicted her sworn testimony in response to the investigative subpoena or was inconsistent with other things she testified to at trial. For example, at the investigative subpoena hearing Foster testified that she saw petitioner shoot Officer Stewart, *see* Trial Tr., Vol. III, at 185, but at trial she denied that she had seen the shooter, *see id*. at 163. Similarly, at the investigative subpoena hearing she testified that the third statement she gave to the police, in which she implicated petitioner, was true, *see id*. at 181, while at trial she claimed that the third statement was not true and had been coerced by the police, *see id*. at 173. Foster also gave directly contradictory testimony at trial. For example, she testified that she knew people were gambling in front of her friend's house, and then denied that she knew this. *See id*. at 156-58. She also testified that she did not see petitioner at the party, but almost immediately changed her testimony, stating that she had seen him but only briefly. *See id*. at 159. Foster testified that her third statement was given to the police after she had been detained by the police for "almost two nights," *id*. at 175, but when confronted with her statement which showed that it had been given

on the same day she had been detained by the police, denied that she had even testified, just a few questions earlier, that she had been detained for two nights, *see id*. at 176.

At the conclusion of Foster's testimony, and outside the presence of the jury, the trial judge held Foster in contempt and ordered her to be placed in custody:

> Now, this Court has heard a transcript where the witness testified under oath. I've also heard this witness testify under oath before this Court.
> Perjury in a homicide case carries life. The witness was warned at the time by the prosecutor of perjury.
> This Court does not have to be a witness to perjury and do absolutely nothing about it.
> Now, I've heard witness after witness making conflicting statements just as easy as you please, and walking out the door. This has to stop. This Court is not going to tolerate that.
> I have heard this witness perjure herself over and over again, under oath. Admit that she said certain things, take it back, and state whatever suited her. This is perjury. The Court will not tolerate that.
> I'm going to order that this witness be placed under arrest, forthwith. Remanded to the county jail until such time that the prosecutor sees fit to bring perjury charges.

Trial Tr., Vol. III, at 203. The following day, an article about the judge's action appeared in the *Detroit Free Press*. The article was on the front page of Section B of the paper, and was headlined "Witness is thrown in jail by judge: She alters her story on seeing cop get killed." The article noted that Judge Townsend had ordered Foster to be placed in custody, and included his statements that Foster had committed perjury and had lied in the courtroom. *See* Pet.'r's Reply Br., Ex. B. During a break in the proceedings, defense counsel brought the article to the court's attention and requested a mistrial. *See* Trial Tr., Vol. IV, at 133-35. The trial court denied the motion, reasoning that

> there's absolutely nothing that was said during this trial that would indicate to any of these jurors, or any person of normal intelligence that these witnesses have made inconsistent statements throughout this trial. They've been exposed to that, they've heard all of that already
> . . . .
> Now, if there's something there – I don't think that there's any – there's nothing that nobody doesn't already know about anyway.

> But I don't think that there's anything there that's going to make the jury feel any different than what they already feel anyway. They've heard the witnesses testify.
>
> They heard they [sic] say things, retract them, say them again, retract them. They heard that, throughout the trial.
>
> There's nothing in that article that's any different from what anybody heard.

*Id*. at 136. When the jury reentered the courtroom, the judge gave a general instruction without explicitly mentioning the newspaper article: "I just wanted to state to you, ladies and gentlemen, that when I started the trial I advised you that the only evidence that you are to, the only thing that you are to consider to make a decision in this case is what you've heard in the courtroom, and the physical exhibits which the Court has admitted. That's all." *Id*. at 138.

On appeal, the Michigan Court of Appeals rejected petitioner's claim, reasoning that

> [t]he trial court specifically instructed the jury on several occasions that newspaper articles are not evidence that they may consider when making their decision, and a jury is presumed to follow their instructions. Moreover, there is no evidence that any jury member was even aware of the article, but even assuming a jury member read the article, it merely revealed facts that the jury witnessed first-hand in the courtroom: Foster gave contradicting testimony and necessarily committed perjury at some point.

*Townsend*, 2006 WL 287856, at *3, slip op. at 3. The Court should conclude that this determination was reasonable.

In the first place, there is absolutely no evidence which suggests that any juror was exposed to the article. Nothing in the record indicates, for example, that a copy of the newspaper was in the jury room or that any juror actually read the article, and petitioner has yet to bring forth any "competent evidence of any improper contact with the jury," and "even now there is no such evidence." *Ida v. United States*, 207 F. Supp. 2d 171, 186 (S.D.N.Y. 2002). Although a hearing was not held, petitioner could have supported his claim in any number of ways, for example, by obtaining affidavits from the jurors. *See Hasan v. Ishee*, No. 1:03-cv-288, 2006 WL 3253081, at *19 (S.D. Ohio Aug. 14, 2006). Nor did counsel's speculative assertion that the jury may have been exposed to the

article require the trial court to conduct a hearing on the matter in the absence of evidence of actual exposure. On the contrary, "[i]n the absence of any showing of actual exposure, . . . the state trial court had no duty to poll the jury." *Tunstall*, 306 F.3d at 611. Thus, the Court has "no evidence in this case that the newspaper in the jury room was the newspaper with the offending article or that the subject article was read by a juror in [petitioner's] case." *Id.*

Further, even assuming that one or more jurors were exposed to the article, petitioner cannot show prejudice. In the first place, the facts related in the article were, for the most part, duplicative of what the jury had already witnessed in court. Because Foster had given testimony under oath at trial which flatly contradicted her earlier testimony under oath in connection with the administrative subpoena, it was apparent that Foster had committed perjury at some point. Further, because some of her testimony under oath at trial contradicted other testimony she gave at trial, it was apparent that she committed perjury at some point during the trial itself. Importantly, nothing in the judge's statements, as reported in the news article, indicated a finding by the judge as to which testimony constituted perjury and which testimony was truthful. For example, the judge did not state that Foster was truthful when she identified petitioner as the shooter in her administrative subpoena testimony but lying when she denied that he was the shooter at trial. Rather, the court's comments were nothing more than an observation that because the two testimonies were directly contradictory, the witness had necessarily committed perjury at some point. The fact of Foster's perjury at some point was already apparent to the jury, and thus the newspaper article was merely duplicative of what the jury had already observed in the courtroom. Such duplicative media exposure is not prejudicial. *See Williams-Davis*, 90 F.3d at 500.

Further, the jury was repeatedly instructed that it should not follow news reports of the case and should base its decision solely on the evidence presented at trial. At the onset of jury selection,

the court inquired whether any of the venire members had seen any news coverage of the case, and excused one member who indicated she had seen coverage and that it had caused her to form an opinion about the case. *See* Trial Tr., Vol. I, at 61-62. Later, when again raising this inquiry, the court explained to the jury that "[r]eading something, or hearing something on the television is not evidence. It's just allegations. . . . Anything can appear in the press, but that's just an account, or a version. The evidence that you decide any case by is what you hear under oath, and what is admitted by the Court during the trial. So if anybody who read it or remembers reading it, that's nothing. It's just a news account, it's not evidence in the case." *Id*. at 123. The following day, during jury selection, the court again explained:

> And ladies and gentlemen, even if you see something or read anything in the papers, remember, that's not evidence in the case. The evidence in the case is what you hear in the courtroom.
> So, we can't stop people from writing things; we can't stop people from reading things. So, you can read all you want. But remember, that's not evidence.
> There are certain rules that we use in court that decide or determine what is admissible as evidence and what is written in the newspapers is not evidence. That's just journalism, or alleged journalism.
> You have to decide the case based on what you hear from the witness stand, and what you hear in the courtroom.

*Id*., Vol. II, at 13. As noted above, on the day the story appeared in the paper, the trial court gave a general instruction that the jury should consider only the evidence admitted in the case in reaching its decision. *See id*., Vol. IV, at 138. And during final instructions the court instructed the jury that it must "decide the case, of course, on the evidence. Now the evidence in this case has been the sworn testimony of the witnesses in court in your presence. And the exhibits which were been [sic] admitted by the Court. That is evidence." *Id*., Vol. VI, at 10. The court also explained that neither questions nor arguments of counsel are evidence, and again instructed that "the evidence in this case is the sworn testimony of the witnesses, the exhibits which were admitted by the Court." *Id*. at 14.

It is well established that a court must presume that a jury follows the instructions given by the trial court. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *see also*, *Shannon v. United States*, 512 U.S. 573, 585 (1994); *United States v. Olano*, 507 U.S. 725, 740 (1993); *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). In light of this presumption, the repeated instructions by the court regarding the evidence the jury should consider in general and the lack of evidentiary value of news accounts, and the limited prejudicial effect of the article on its face, the court of appeals's conclusion that petitioner was not denied a fair trial was reasonable. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.      *Evidentiary Issues (Claims III & V)*

In his third and fifth claims, petitioner contends that he was denied a fair trial with respect to various evidentiary issues. In his third claim, he contends that he was denied a fair trial by the trial court's limitations on cross-examination and by the prosecutor's failure to produce a *res gestae* witness. In his fifth claim, petitioner contends that he was denied a fair trial when the trial court allowed admission of several witnesses' prior statements as substantive evidence of guilt. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Limitation on Cross Examination*

Petitioner first contends that he was denied a fair trial by the trial court's restriction on his cross-examination of Tamika Gilmore.[2] Although petitioner asserts this claim as a general due process violation, it is more properly analyzed as a denial of confrontation claim under the Sixth Amendment.

---

[2]Petitioner also contends that the trial court improperly limited his cross-examination of Officer Carlisle at the hearing on the voluntariness of his confession. This claim is addressed in connection with petitioner's confession claim, *infra.*

*a. Clearly Established Law*

The Supreme Court's "Confrontation Clause cases fall into two broad categories: cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or by the trial court on the scope of cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 18 (1985) (per curiam). The latter category, which is implicated here, recognizes that "[c]onfrontation means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). Thus, in cases where the trial court has restricted cross-examination in some manner, "the Court has recognized that Confrontation Clause questions will arise because such restrictions may 'effectively . . . emasculate the right of cross-examination itself.'" *Fensterer*, 474 U.S. at 19 (quoting *Smith v. Illinois*, 390 U.S. 129, 131 (1968)).

However, the Supreme Court has also explained that the Confrontation Clause does not "guarantee cross-examination that is effective in whatever way and to whatever extent the defense might wish." *Fensterer*, 474 U.S. at 20. The question is whether the trial court's ruling allowed for "substantial compliance with the purposes behind the confrontation requirement," or, put another way, whether petitioner was "significantly limited in any way in the scope or nature of his cross-examination." *Green*, 399 U.S. at 166. Thus, "[s]o long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination." *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998); *see also*, *United States v. Larranaga*, 787 F.2d 489, 498 (10th Cir. 1986). Further, even if a restriction on cross-examination amounts to a violation of the confrontation right, such an error may be harmless. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

*b. Analysis*

At trial, Tamika Gilmore testified that petitioner was at her house on the evening of August

10, 2002, and told her that there was going to be a party "over at Corbett Street," but did not state whether he was going to the party. Trial Tr., Vol. III, at 209. When she returned home later in the evening, petitioner was at her house. Petitioner was looking to see if her car was there. *See id*. at 214-15. He asked her to drive him. *See id*. at 215. The following day, on cross-examination, counsel fully explored Gilmore's interaction with petitioner on the night of the shooting. He elicited from Gilmore that petitioner had asked her to drive him to the west side of the city, but that she had told him to "call Barbara." Petitioner told her he had lost his cell phone. They went over to Gilmore's grandmother's house, where petitioner made a phone call. Barbara arrived and petitioner left, but they came back. She went to sleep, and when she awoke petitioner was there and asked her for a ride to the east side of the city. *See id*., Vol. IV, at 6-8. Counsel then explored the substance of Gilmore's conversations with petitioner during the drive:

> Q:    Did you have any conversations with Mr. Townsend on the way back over to
>        the east side, about what might have happened over on Corbett Street?
> A:    Mainly we was talking about David.
> Q:    I'm sorry?
> A:    We were talking about David, my friend.
> Q:    All right. So you didn't talk at all about what happened on Corbett Street?
> A:    Not till we got to the east side.
> Q:    All right. Because you asked Mr. Townsend about, "What happened around
>        here?"; right?
> A:    Yes.
> Q:    Mr. Townsend says, "I think somebody got shot"; right?
> A:    Yes.

*Id*. at 8-9. On redirect examination, the prosecutor asked: "In fact Tony Townsend told you that he busted up off Corbett Street because he wasn't going to jail; he wanted to get away from there because it was hot; right?" Gilmore responded, "Right." *Id*. at 12. On recross counsel, noting the prosecutor's question about it being "hot over there," asked: "But he told you other things; didn't he?" *Id*. at 13. Gilmore responded, "Yes." When counsel attempted to elicit what else petitioner had said,

the court sustained the prosecutor's objection, concluding that the testimony would be hearsay because it was not admissible under the statement against interest exception to the hearsay rule. *See id.* at 13-14.

Petitioner's claim fails, for several reasons. First, in *Davis v. Alaska*, *supra*, the Court held that the Sixth Amendment right to confront witnesses guarantees a criminal defendant the right to cross-examine adverse witnesses to expose bias and motivations for testifying. *See id.* at 315-16; *see also*, *Delaware v. Van Arsdall*, 475 U.S. 673, 678-80 (1986). However, the *Davis* Court limited its Confrontation Clause decision to those facts going to a witness's bias or motive in testifying, as opposed to general attacks on credibility. The Court's decision in *Van Arsdall* was similarly limited. Indeed, in his concurring opinion in *Davis*, Justice Stewart emphasized that the *Davis* "Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination" concerning past convictions. *Davis*, 415 U.S. at 321 (Stewart, J., concurring). Thus, the Sixth Circuit has explained that the cross-examination right protected by the Confrontation Clause is limited to cross-examination directed at eliciting a witness's bias or motive to testify falsely; it does not protect cross-examination designed to elicit substantive evidence or facts going to a witness's general credibility. *See Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000). Because the question counsel sought to ask did not go to the witness's bias or motive for testifying, the court's preclusion of the testimony did not violate the Confrontation Clause.

More importantly, petitioner cannot show that this ruling "significantly limited [him] in any way in the scope or nature of his cross-examination." *Green*, 399 U.S. at 166. On cross examination petitioner's counsel fully explored the interactions between Gilmore and petitioner on the night of the shooting, and did so without objection from the prosecution. While counsel may not have elicited from Gilmore everything that petitioner had said, he was able to elicit that petitioner indicated merely

that a shooting had occurred, with no testimony from Gilmore that petitioner admitted to being the shooter. Further, at no point during the cross-examination was counsel precluded from asking any questions about the conversations between Gilmore and petitioner. There is no general constitutional right to recross-examination; a denial of recross-examination implicates the Confrontation Clause only where it prevents the defendant from exploring new matters raised for the first time on redirect examination. *See United States v. Payne*, 437 F.3d 540, 549-50 (6th Cir. 2006); *United States v. Lopez-Cuevas*, 152 Fed. Appx. 665, 666 (9th Cir. 2005); *United States v. Ross*, 33 F.3d 1507, 1518 (11th Cir. 1994). Petitioner does not contend that he was prohibited from exploring any new matters that had been raised on the prosecutor's redirect examination of Gilmore, and counsel's initial cross examination adequately explored the interactions between Gilmore and petitioner. Thus petitioner cannot show that his right to confront the witness was violated, and the Court should conclude that he is not entitled to habeas relief on this claim.

2. *Failure to Produce Res Gestae Witness*

Petitioner next contends that counsel was ineffective for failing to produce a known *res gestae* witness, Lergiald Alexander. Petitioner contends that Alexander had traces of gun residue, and that he sought to question Alexander because he may have been involved in the shooting of Officer Stewart. At the conclusion of the prosecutor's case in chief, defense counsel indicated that he wanted Alexander, who was listed as a *res gestae* witness, to be produced. The prosecutor responded that two weeks prior to trial, she had informed counsel to let her know about any witnesses counsel wanted produced at trial, and counsel had given her only the name of a police officer; counsel had not indicated that he wanted Alexander produced. Counsel responded that he expected a witness who was listed to be produced. The prosecutor also argued that Alexander was not a *res gestae* witness, because he did not arrive until after the shooting. Counsel responded that Alexander had been

detained, and that a gunshot residue test on his hands was positive, so he was a plausible alternative suspect. The prosecutor disagreed, noting that police forensic chemist Hayden Dannug had already testified that no gunshot residue was found on Alexander. *See* Trial Tr., Vol. V, at 81-84; *see also*, *id.*, Vol. IV, at 151 (Dannug testimony regarding Alexander's gunshot residue test results). The trial judge instructed counsel to proceed with his case, and he could present the witness the following day if he still so desired and if they were present at the court; otherwise, the court would strike the witnesses. *See id.*, Vol. V, at 92. Despite the judge's ruling that petitioner could present the witnesses the following day if they could be located, counsel rested after petitioner's testimony. *See id.* at 151. On direct appeal the court of appeals rejected petitioner's claim, concluding that Alexander would not have aided petitioner's defense because the evidence showed that he arrived on the scene after the shooting and did not have gunshot residue on his hands, and that there was "no evidence that the prosecution failed to provide reasonable assistance in locating him, given defendant's request for his production less than three hours before the defendant rested his case." *Townsend*, 2006 WL 287856, at *4, slip op. at 5. The Court should conclude that this determination was reasonable.

Michigan law requires a prosecutor to list all *res gestae* witnesses. *See* MICH. COMP. LAWS §§ 767.40-.40a; *see also, People v. Jones*, 641 Mich. App. 659, 236 N.W.2d 531 (1975); *People v. Anderson*, 64 Mich. App. 218, 235 N.W.2d 746 (1975). Under Michigan law, a *res gestae* witness is "one who was an eyewitness to some event in the continuum of a criminal transaction and whose testimony will aid in developing a full disclosure of the facts surrounding the alleged commission of the charged offense." *People v. Hadley*, 67 Mich. App. 688, 690, 242 N.W.2d 32, 34 (1976). The statute does not, however, require the prosecutor to call all listed witnesses. In any event, any failure of the prosecutor with respect to a *res gestae* witness raises solely a claim of state law. It is well established that errors of state law do not provide a basis for habeas relief. *See Estelle v. McGuire*,

502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Thus, petitioner's claim that the prosecutor violated state law regarding the production of res gestae witnesses is not cognizable on habeas review. *See Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 601 (E.D. Mich. 2001) (Tarnow, J.).

Petitioner does not explicitly argue that the prosecutor's failure to produce these witnesses violated his rights under the Sixth Amendment's Confrontation and Compulsory Process Clauses. Regardless, any such claim would be without merit. The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor[.]" U.S. CONST. amend. VI. With respect to the Confrontation Clause, under the Sixth Amendment "[a] defendant has no right to confront a 'witness' who provides no evidence at trial. Nor is the government required to call all of the witnesses to a crime." *United States v. Heck*, 499 F.2d 778, 789 n.9 (9th Cir. 1974) (citations omitted) (internal quotation omitted); *see also, United States v. Bryant*, 461 F.2d 912, 916 (6th Cir. 1972); *United States v. Polisi*, 416 F.2d 573, 579 (2d Cir. 1969); *Mitchell v. United States*, 359 F.2d 833, 836 n.3 (7th Cir. 1966). For this reason, the Sixth Circuit and Judges of this Court have repeatedly found that the prosecution's failure to endorse or call a *res gestae* witness in accordance with Michigan law does not raise a constitutional claim cognizable on habeas review. *See, e.g., Smith v. Elo*, No. 98-1977, 1999 WL 1045877, at *2 (6th Cir. Nov. 8, 1999); *Moreno v. Witbrow*, No. 94-1466, 1995 WL 428407, at No. 94-1466, 1995 WL 428407, at *1 (6th Cir. July 19, 1995) (per curiam); *Lewis v. Jake*, No. 88-1522, 1989 WL 145895, at *3 (6th Cir. Dec. 4, 1989) (per curiam); *Atkins v. Foltz*, No. 87-1341, 1988 WL 87710, at *2 (6th Cir. Aug. 24, 1988) (per curiam); *Johnson*, 159 F. Supp. 2d at 601.

With respect to the Compulsory Process Clause, as a general matter that Clause "grants a criminal defendant the right to call witnesses that are 'material and favorable to his defense.'" *Wong v. Money*, 142 F.3d 313, 324 (6th Cir. 1998) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Unfortunately, the Supreme Court has provided little guidance on the exact contours of the Compulsory Process Clause. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 55 & n. 12 (1987) (noting that the Compulsory Process Clause has rarely been a factor in the Court's decisions). Nevertheless, some general principles do exist to guide the Court's determination. First, as a general matter the clause establishes, "at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Id.* at 56. Second, it is clear that the right to compulsory process is not absolute; thus, in certain circumstances a witness may be precluded from testifying as a sanction for defendant's failing to comply with a discovery order, *see Taylor v. Illinois*, 484 U.S. 400, 410-14 (1988), and testimony is subject to general evidentiary rules such as those governing relevance and privilege, *see Washington v. Texas*, 388 U.S. 14, 23 n.21 (1967); *Smith v. Cromer*, 159 F.3d 875, 882 (4th Cir. 1998). Because petitioner never sought to present either Jackson or Hamilton as a witness, his right to present a defense was not violated.

To the extent that petitioner claims he was entitled to question Alexander as a matter of the Compulsory Process Clause, this claim fails. First, petitioner was not denied the court's assistance in locating Alexander. The record establishes that counsel did not indicate a desire to have Alexander testify until the middle of trial, after the prosecutor had rested. Petitioner never subpoenaed Alexander, and despite the trial court's ruling that petitioner could produce the witness the following day, counsel did not at that time request a subpoena, bench warrant, or the prosecutor's assistance in locating Alexander. *See Green v. Estelle*, 488 F.2d 918, 920 (5th Cir. 1973) (no denial of compulsory

process where defendant did not attempt to call witness or ask for a continuance to do so, and the "state court was left totally unaware of the defendant's desire to call" the witness); *United States v. Mickens*, 837 F. Supp. 745, 748 (S.D. W. Va. 1993), *aff'd*, 53 F.3d 329 (4th Cir. 1995). Further, as the Supreme Court has explained, "more than mere absence of testimony is necessary to establish a violation of the right [to compulsory process]." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 866 (1982). The Sixth Amendment does not provide a defendant the right to process for obtaining any witness, only "witnesses in his favor." U.S. CONST. amend. VI. "This language suggests that [a defendant] cannot establish a violation of his constitutional right to compulsory process merely by showing that [he was deprived of witnesses' testimony]. He must at least make some plausible showing of how their testimony would have been both material and noncumulative evidence in support of his defense. *See Valenzuela-Bernal*, 458 U.S. at 873 (defendant must show that the evidence "would have been material and favorable in ways not merely cumulative to the testimony of available witnesses."). Petitioner has failed to show what favorable evidence Alexander would have provided. The only evidence in the record with respect to Alexander indicates both that Alexander did not arrive on the scene until after the shooting, and that contrary to petitioner's claim Alexander did not test positive for gunshot residue. Thus, petitioner has failed to show that Alexander's testimony would have been material. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

3.      *Prior Inconsistent Statements*

Petitioner next contends that he was denied a fair trial when several witnesses' prior inconsistent statements were admitted as substantive evidence at trial. This claim fails, for two reasons.

First, the rule prohibiting the use of a prior inconsistent statement as substantive evidence of

guilt is not a rule of constitutional dimension. *See Isaac v. United States*, 431 F.2d 11, 15 (9th Cir. 1970). Thus, the use of these witnesses' prior inconsistent statements, even if contrary to state evidence law, does not raise a federal constitutional claim cognizable on habeas review. *See Neal v. McKee*, No. 04-CV-40275, 2006 WL 846747, at *7 (E.D. Mich. Mar. 29, 2006) (Gadola, J.); *Catlett v. Stovall*, No. 05-CV-72890, 2006 WL 3103687, at *5 (E.D. Mich. Oct. 31, 2006) (Rosen, J.).

Second, petitioner cannot show that the evidence was improperly admitted as substantive evidence. Under the hearsay rules, the prior statement of a witness may be admitted as substantive evidence if (1) "the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement;" (2) the statement is "inconsistent with the declarant's testimony;" and (3) the prior statement "was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." MICH. R. EVID. 801(d)(1)(A). Each of these elements was satisfied with respect to the prior statement admitted at petitioner's trial. The statements were admitted on examination of the witnesses at trial, were inconsistent with their trial testimony, and were given under oath in connection with the investigative subpoena hearings. The prior testimony was thus admissible as substantive evidence. *See* MICH. R. EVID. 801(d)(1)(A); *People v. Tipton*, No. 216487, 2000 WL 33385187, at *1 (Mich. Ct. App. Dec. 26, 2000); *People v. Andrews*, No. 215200, 2000 WL 33400219, at *2 (Mich. Ct. App. Nov. 21, 2000); *see also*, *United States v. Woods*, 613 F.2d 629, 637 (6th Cir. 1980) (reaching same conclusion under identical Federal Rule of Evidence); *cf. California v. Green*, 399 U.S. 149, 164 (1970) (admission of prior inconsistent statement given under oath as substantive evidence does not violate Confrontation Clause). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Confession Claims (Claim IV)*

Petitioner next challenges the admission of his confession to the police, which he claims was

involuntary. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1. *Factual Background Relating to Petitioner's Confession*

Prior to trial, petitioner challenged the admissibility of his statement, and the trial court held an evidentiary hearing on the matter. The evidence adduced at the hearing was accurately summarized in petitioner's brief on direct appeal:

> On June 23, 2003, prior to the commencement of trial, a <u>Walker</u> hearing was held on the issue of whether the defendant/appellant's purported "statement" was going to be admitted at trial. The first witness to testify was Officer Michael Carlisle who indicated that he was notified on August 11, 2002 at approximately 4:30 in the morning to assist in the investigation of the murder of Police Officer Scott Stewart. According to Officer Carlisle, Tony Townsend "had turned himself in during the night" and "was in a room on the fifth floor."
>
> Officer Carlisle entered the room and noticed Mr. Townsend asleep on the table and after Mr. Townsend awoke, the officer allowed him to use the bathroom and gave him a sandwich. Officer Carlisle had been apprised by Lt. McCalister that there had been a brief conversation and interview at the time Mr. Townsend turned himself in.
>
> On cross-examination, Officer Carlisle explained that he was informed he was to be the officer-in-charge of the case and he looked through witness statements and police reports prior to introducing himself to Tony Townsend. Furthermore, he was aware that Mr. Townsend had denied involvement in the shooting and "had given two or three conflicting statements, and that Mr. Townsend was tired, he was tired, and [McCalister] had concluded the interview sometime early that morning."
>
> Later that day, at about 5:00 p.m., Officer Carlisle was unable to procure a statement so he allowed Mr. Townsend to speak with his girlfriend Barbara Sochacki. Defense counsel then attempted to question Offier Carlisle about allegations that he had beaten Mr. Townsend with a phone book. The Court would not permit the line of questioning on the basis that this officer had himself not taken any statement from Mr. Townsend.
>
> The next witness was Detroit Police Officer Derrick Thomas who indicated that he came in contact with Tony Townsend while working at the homicide department, special assignment squad. According to Officer Thomas, he was not sure if Mr. Townsend "had previously been interviewed or investigated by one of the members of his squad." Mr. Townsend was advised of his Constitutional Rights, according to Officer Thomas, and Mr. Townsend initialed each right and signed the form. According to Officer Thomas, a 10 page statement was then taken in question and answer format and at the end of the statement Mr. Townsend wrote out a few sentences in red ink in his own handwriting.
>
> On cross-examination, Officer Thomas stated that prior to interviewing Mr. Townsend he had "access to everything in the file" but he was not aware that Lt.

McCalister had attempted to interview Mr. Townsend and had completed an interrogation record. Officer Thomas advised Mr. Townsend of his Constitutional Rights before taking a formal statement.

Tony Townsend testified next that he spoke with Lt. McCalister on August 12, 2002, and was told "that he had a witness in my so-called family stating that I said I did this, or they witnessed I did it" and that this was a lie. At that point, Mr. Townsend "told him I would like a lawyer" and, in fact, made this request "at least a good eight times." Further, Mr. Townsend denied that the officer brought him anything to eat and that he ate nothing until "after 8:00 p.m. on the 12th."

Mr. Townsend recalls seeing his fiancé, Barbara Sochacki, appear at the precinct, that she was hysterical and he thought they had done something to her. Mr. Townsend told Officer Thomas that he was not involved in the shooting but the officers continued to threaten him. According to Mr. Townsend, Officer Carlisle grabbed a phone book and slapped him "upside the head." Furthermore, several officers were threatening Mr. Townsend and his family and intimated that Mr. Townsend's family members, specifically his "so-called little sister," had gunpowder residue on her hair, her fingers and that she was going to be charged.

The Court admitted the transcript of Lt. McCalister from the preliminary examination in lieu of his live testimony and ruled that it accepted the testimony of the officers and did not accept the testimony of the defendant and denied defendant/appellant's motion to suppress the statement. The matter immediately thereafter proceeded to trial.

Def.-Appellant's Br. on Appeal, in *People v. Townsend*, No. 252371 (Mich. Ct. App.), at 1-3 (citations to transcript omitted).

2.    *Miranda*/Voluntariness

Petitioner contends that his statement was involuntary and taken in violation of his rights to remain silent and to counsel. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

a. *Clearly Established Law*

As the Supreme Court explained in *Jackson v. Denno*, 378 U.S. 368 (1964), "a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession." *Jackson*, 378 U.S.

at 376. "Determining whether a confession is 'voluntary' for due process purposes entails an examination into the 'totality of the circumstances' to determine whether the confession was procured by acceptable techniques that draw upon an essentially free and unconstrained choice or by unacceptable tactics that extract their results from an overborne will. The critical line of distinction is between 'self-direction' and 'compulsion.'" *Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *accord Dickerson v. United States*, 530 U.S. 428, 434 (2000). It is not enough that a defendant's will was "overborne" by some factor for which state officials are not responsible. "Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession." *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). There is no bright line test for determining whether a confession is voluntary, nor is any one factor dispositive. Rather, a court must "look[] to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case. Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishments, such as the deprivation of food or sleep." *United States v. Mahan*, 190 F.3d 416, 422-23 (6th Cir. 1999) (internal quotation and citation omitted); *accord*, *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997); *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994).

For purposes of habeas review, "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a [legal] matter for independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). However, a state court's findings of historical fact are presumed by this Court

to be correct unless rebutted by petitioner with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). *See generally*, *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963) (factual findings entitled to a presumption of correctness under the habeas statutes are those relating to "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators.") (internal quotation omitted). Thus, "subsidiary factual questions, such as whether . . . in fact the police engaged in the intimidation tactics alleged by the defendant are entitled to the § 2254[(e)(1)] presumption." *Miller*, 474 U.S. at 112; *see also*, *id.* at 117.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court considered the applicability of the Fifth Amendment's Self-Incrimination Clause to custodial interrogations by the police. The Court ruled that, in some circumstances, statements made while in custody can violate the Self-Incrimination Clause even if the statement was otherwise "voluntary" under the Due Process Clause. As the Court has more recently explained, the *Miranda* decision

> concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be "accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself." [*Miranda*, 384 U.S.] at 439. Accordingly, we laid down "concrete guidelines for law enforcement agencies and courts to follow." *Id.*, at 442. Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as "Miranda rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of any attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires." *Id.*, at 479.

*Dickerson v. United States*, 530 U.S. 428, 435 (2000) (parallel citations omitted). The *Miranda* Court explained that if the suspect indicates that he wishes to remain silent, "the interrogation must cease." *Miranda*, 384 U.S. at 474. Similarly, if the suspect requests counsel "the interrogation must cease until an attorney is present." *Id.*; *see also*, *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

Although it has been characterized otherwise at times, the rule of *Miranda* is of federal constitutional dimension. *See Dickerson*, 530 U.S. at 438-40. Thus, claims based on the right to counsel at questioning recognized in *Miranda* are cognizable on habeas review. *See id.* at 439 n.3; *Thompson v. Keohane*, 516 U.S. 99, 107 n.5 (1995).

In determining the validity of the police interrogation, the ultimate issues of whether petitioner waived his rights to remain silent and to counsel are legal determinations to be reviewed under § 2254(d)(1). *See, e.g.*, *Thompson*, 516 U.S. at 112-13 (determination of whether interrogation was a "custodial interrogation" under *Miranda* is a legal determination not subject to the presumption of correctness for state court findings of historical fact); *Brewer v. Williams*, 430 U.S. 387, 397 n.4 (1977) (same as applied to question of whether petitioner validly waived his Sixth Amendment right to counsel). However, as with the voluntariness issue, the state courts' resolution of the underlying historical facts are presumed correct unless rebutted by clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1).

### b. Analysis

Petitioner contends that his statement was involuntary and taken in violation of his *Miranda* rights because he was assaulted; he was denied food, water, and use of the toilet; and had repeatedly requested an attorney. His claim, however, is dependent upon his version of the facts. As noted above, the officers testified to a different version of facts, and petitioner does not contend, nor does the record support, that under the officers' version of events his confession was involuntary or he was denied his right to counsel. As the Michigan Court of Appeals explained:

> Three police officers testified that, prior to giving a statement and on more than one occasion, defendant read his constitutional rights aloud and signed a waiver form, marking his initials after each listed right. Police also testified that defendant was coherent during the interrogation, they never hit him with a phonebook, they never threatened him, and they fed him after approximately eight hours of detention. Thomas

stated that defendant reviewed his statement after Thomas wrote it, made corrections in his own handwriting, initialed each of the ten pages and, at the end of the statement, defendant added comments in his own hand indicating that his family had nothing to do with what happened, expressing that he was sorry for the pain he had caused, and asking for forgiveness from Stewart's family. Also on the statement, defendant specifically indicated that Thomas did not threaten or physically harm him and that he had signed and read a constitutional rights waiver form. The trial court determined that defendant's statement was voluntary, finding that, prior to giving the statement, defendant was advised of his rights and understood those rights, as acknowledged by him on the constitutional rights form.

*Townsend*, 2006 WL 287856, at *5, slip op. at 5-6. The trial court was in the position to observe the demeanor of the witnesses and hear their testimony, and as noted above the trial court's factual findings are presumed correct. Petitioner has failed to offer any clear and convincing evidence to rebut the trial court's conclusion that petitioner's account of the interrogation was not credible, as required by § 2254(e). Because petitioner makes no argument that his confession was involuntary under the version of events testified to by the officers and accepted by the trial court, petitioner cannot show either that the state courts' resolution of this claim was unreasonable application of clearly established law under § 2254(d)(1), or that it was based on an unreasonable determination of the facts under § 2254(d)(2). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### 3. *Limitation on Cross-Examination at Evidentiary Hearing*

Petitioner also contends that the trial court erred in limiting his cross-examination of Officer Carlisle at the *Walker* hearing. At that hearing, counsel began a series of questions directed at establishing whether Carlisle had hit petitioner with a phone book. *See* Trial Tr., Vol. I, at 22. Counsel asked whether Carlisle had access to a phone book, to which Carlisle responded: "If you can find one over there, good luck. Because every time we go for a general yellow pages of a phone book we can never find one." *Id*. at 23. Counsel then asked, "So . . . there would have been no way for you

to use one of those phone books across the head of this young man; right?" *Id.* at 23. Carlisle denied the allegation, stating: "Special care was taken with Mr. Townsend to have no officer that had any type of attitude or animosity displayed towards him because of the nature of an on-duty police officer getting killed. We were not going to have any allegations come back of any physical assault on Mr. Townsend." *Id.* Counsel then attempted to ask Carlisle whether hitting someone over the head with a phone book would leave any marks or bruises. It was at this point that the trial court cut off counsel's inquiry as straying from the purpose of the hearing. *See id.* at 23-24.

Petitioner cannot show how the trial court's ruling deprived him of a fair hearing on his voluntariness claim. Counsel asked Carlisle whether he had struck petitioner with a phone book, and Carlisle denied that he had done so. Speculative questioning about whether striking a person with a phone book would leave a mark or a bruise was beside the point, because Carlisle denied that he struck petitioner. Petitioner, through counsel, was able to fully explore with Carlisle the circumstances of the interrogation and Carlisle's actions with respect to petitioner. Thus, petitioner is not entitled to habeas relief on this claim.

I.      *Ineffective Assistance of Counsel (Claims IX & X)*

Petitioner next raises several ineffective assistance of counsel claims. Specifically, petitioner contends that his trial counsel was ineffective for failing to: (1) object to the introduction of Lt. McCallister's preliminary examination testimony; (2) object to the testimony of the victim's mother and the introduction of photographs; (3) investigate and call key witnesses; (4) produce character evidence to impeach Officer Thomas; and (5) object to prosecutorial misconduct. Petitioner also contends that his appellate counsel was ineffective for failing to raise his motion for relief from judgment claims on direct appeal. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protects the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *See id*. at 688. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the *Strickland* inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

2.      *Trial Counsel*

a.  *Failure to Object to Lt. McCallister's Testimony*

Petitioner first contends that counsel was ineffective for failing to object to the introduction of Lt. McCallister's preliminary examination testimony, which was introduced at trial because Lt. McCallister was unavailable. Petitioner does not contend that the preliminary examination testimony in general was not properly admitted. Rather, he contends that a portion of the examination reflecting Lt. McCallister's opinion that petitioner was not being truthful when he first denied the crime should not have been admitted. At the preliminary examination, defense counsel questioned McCallister about why he had failed to note in the police reports that petitioner initially denied committing the shooting. McCallister responded that "I can't put something if I felt somebody is lying sir." Trial Tr., Vol. IV, at 202. When asked upon what he based his opinion that petitioner was lying, McCallister responded, "Gathered facts, information, documents, reports, statements," and also indicated that he relied on the witnesses, although he did not specifically name any witnesses. *Id*. at 203-04. Petitioner contends that this information constituted impermissible opinion on the veracity of petitioner and the witnesses, and that counsel should have sought to exclude this information. The Court should disagree.

Counsel had a good basis for not excluding this portion of McCallister's testimony. Petitioner's defense at trial was that he was not the shooter, that the police had coerced him to confess, and that the police had coerced the other witnesses to implicate him. A large part of petitioner's claim that the police had coerced him was the fact that he had initially denied his involvement in the shooting, and one indication of police coercion was the fact that the police had failed to note his initial denials in their reports. Further, once petitioner pursued this line of attack, McCallister's reasons for failing to note petitioner's denials became relevant, and thus the testimony would not have been excluded even if counsel had objected. Although McCallister commented on petitioner's credibility, that was a relevant factor that went not to petitioner's credibility at trial, but the reasons why

McCallister did not believe him after his arrest. And contrary to petitioner's argument, McCallister did not comment on the credibility of any particular witness, noting only that the entirety of the evidence before him had led him to conclude that petitioner was lying. Further, petitioner has offered no basis on which to conclude that there is a reasonably probability that the result of the proceeding would have been different had this brief testimony been excluded. Thus, petitioner cannot show that counsel was ineffective for failing to object to this portion of Officer McCallister's preliminary examination testimony.

### b. Failure to Object to Testimony of Victim's Mother and Photographs

Petitioner next contends that counsel was ineffective for failing to object to the testimony of the victim's mother and to the introduction of prejudicial photographs. The Court should conclude that petitioner is not entitled to relief on these claims.

Audrey Stewart, the victim's mother, testified that the victim had been an officer for five years and was engaged to be married. She testified that she was called to the hospital and that the victim was alive when she got there, but that he was subsequently taken off of life support. *See* Trial Tr., Vol. II, at 74-77. She also identified a picture of her son taken in uniform, which was displayed for the jury. Even assuming that this evidence was not admissible, petitioner has failed to show how the testimony deprived him of a fair trial. The evidence was brief, and served only to identify the victim. The issue at trial was petitioner's guilt as the shooter, an issue which was addressed by the various witnesses' testimony at trial and in the investigative subpoena hearings, and petitioner's own statement to the police. There is not a reasonable probability that, had the evidence been excluded, the result of the proceeding would have been different.

Petitioner also contends that counsel was ineffective for failing to object to photographs of guns found in the home of witness Linda Little. At trial, Little testified that she was coerced into

signing a statement implicating petitioner because the police threatened to charge her with possessing a number of guns which were found under a mattress in her home. The photographs, which showed a number of weapons including assault rifles, were relevant to rebut Little's assertion that the charges raised by the police lacked merit because she did not know about the guns. The number, nature, and size of the guns, as depicted by the photographs, was probative of Little's claim that she did not know that the guns were under the mattress. Thus, petitioner cannot show that this evidence was objectionable. And, in any event, petitioner cannot show how the admission of these photographs deprived him of a fair trial. The guns had nothing to do with the case beyond impeaching Little, and the prosecutor never suggested that petitioner possessed these guns or had any connection with them whatsoever. There is not a reasonable probability that had this tangential evidence been excluded the result of the proceeding would have been different. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Failure to Investigate, Call Witnesses, and Impeach Thomas

Petitioner next contends that counsel was ineffective for failing to investigate and call witnesses at trial. "Complaints of uncalled witnesses are not favored in federal habeas review." *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985); *Aponte v. Scully*, 740 F. Supp. 153, 158 (E.D.N.Y. 1990). As one court has explained:

> The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial. [Defendant] does not identify any witnesses that his counsel should have called who would have been helpful. Defense counsel's conduct in this regard appears to fall within the wide range of reasonable professional representation. Decisions whether to engage in cross examination, and if so to what extent and in what manner, are similarly strategic in nature.

*United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *accord Reese v. Fulcomer*, 946 F.2d 247, 257 (3d Cir. 1991) (counsel's performance not deficient where counsel did not call alibi witness

whose testimony could have been damaging); *United States v. Porter*, 924 F.2d 395, 397 (1st Cir. 1991) (decision not to call witnesses who could have incriminated defendant within scope of informed professional judgment). Further, it is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same). Thus, "a petition for habeas corpus relief based on counsel's failure to call witnesses must present this evidence in the form of the actual testimony by the witness or affidavits." *United States ex rel. Townsend v. Young*, No. 01 C 0800, 2001 WL 910387, at *5 (N.D. Ill. Aug. 8, 2001) (citing *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991)); *see also*, *Harrison v. Quarterman*, 496 F.3d 419, 428 (5th Cir. 2007); *Dows v. Woods*, 211 F.3d 480, 486 (9th Cir. 2000).

Petitioner first contends that counsel was ineffective for failing to investigate evidence contained in the police progress notes. Specifically, petitioner notes that the progress notes relate that police were pursuing information about a suspect identified as "E" shortly after the murder. Petitioner contends that "E" is possibly Edzzit Charles Walton, who lived on Corbett at the time of the shooting. *See* Reply, Appx. I. In a statement, witness L.C. Green stated that he saw "E" with a gun on the day of the shooting, but that he did not see the shooting because he had left by that time. *See id.*, Appx. J. Nothing in the police report suggests what interest the police had in "E," other than the fact that he may have been at the party and may have had a gun. However, petitioner has presented no evidence that "E" was the shooter. Petitioner does not contend that a further investigation could have uncovered additional evidence which established that "E" was, in fact, the shooter. Rather, petitioner's claim suggests that the existence of "E" would have provided another plausible suspect to present to the jury. However, counsel had already pointed to a number of other suspects, including at least one who had tested positive for gunshot residue, yet the jury rejected that evidence in favor

of the evidence implicating petitioner, notably the investigative subpoena testimony of the witnesses, petitioner's conduct after the shooting, and petitioner's own statement to the police. Without some suggestion of what additional evidence counsel could have uncovered, there is not a reasonable probability that presenting another plausible suspect to the jury, in addition to the plausible suspects already presented by counsel, would have altered the jury's assessment of the evidence. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner also contends that counsel was ineffective for failing to investigate and present evidence of "questionable police work" in the Detroit Police Department. In support of this claim, petitioner presents a newspaper article relating to the murder conviction of Vidale McDowell. This article presents a view of McDowell's case from McDowell and his friends or relatives. *See* Reply, Appx. L. That a person convicted of murder feels that the police did a poor investigation job hardly speaks to whether this is in fact so. The article likewise suggests that Officer Thomas, who took petitioner's statement, had lost a suspect's statement and subsequently coerced that suspect into implicating his accomplice. Again, however, the article is of limited probative value, being based as it is on one particular view of the McDowell case sympathetic to McDowell. In any event, petitioner cannot show how any of this was relevant to his trial. Although petitioner raised claims that the police coerced both his confession and the statements of witnesses implicating him, these claims and the evidence to support them was presented to petitioner's jury. Petitioner does not explain how police misconduct in other cases, either in general or with respect to Thomas in particular, would have been relevant or admissible in his trial. *Cf. United States v. Leon-Lopez*, 891 F. Supp. 138, 149 (S.D.N.Y. 1995); MICH. R. EVID. 608(b) ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence."). Accordingly, petitioner cannot show that he was

prejudiced by counsel's failure to pursue this evidence.

### d. Failure to Object to Prosecutorial Misconduct

Finally, petitioner contends that he was denied a fair trial by counsel's failure to object to various instances of prosecutorial misconduct. Because the underlying claims of prosecutorial misconduct are without merit, petitioner cannot show that counsel was ineffective for failing to object. Specifically, petitioner contends that the prosecutor committed misconduct during opening statement and closing argument be referring to him as a "murderer" and "coward," and by eliciting sympathy for the victim through comments about the life of a police officer. Petitioner has failed to show that the prosecutor's comments, even if improper, were sufficiently prejudicial to deprive him of a fair trial. The prosecutor's references to petitioner as a murderer did not inject into the trial anything that was not already apparent from the prosecutor's argument respect petitioner's guilt. *See Kappos v. Hanks*, 54 F.3d 365, 367-68 (7th Cir. 1995) (petitioner not denied a fair trial where prosecutor referred to him as a "murderer" and "artful liar"). Likewise, the prosecutor's references to the victim's life as a police officer were much less prejudicial than other comments referring to victims which have been upheld on habeas review. *See, e.g.*, *Brechen v. Reynolds*, 41 F.3d 1343, 1355-56 (10th Cir. 1994); *United States ex. rel. Rockman v. DeRobertis*, 717 F. Supp. 553, 569-70 (N.D. Ill. 1989)(prosecutor's reference to victim "in his grave crying out for a guilty verdict" did not deprive petitioner of a fair trial); *Kordenbrock v. Scroggy*, 680 F. Supp. 867, 896-96 (E.D. Ky. 1988)(petitioner was not denied a fair trial where, during the guilt-innocence phase of the trial, the prosecutor admonished the jury not to forget the victim because "he had a right to live."), *rev'd on other grounds*, 919 F.2d 1091 (6th Cir. 1999)(en banc).

Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir.

1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993). Because petitioner's underlying prosecutorial misconduct claims are without merit, petitioner cannot show that he counsel was ineffective for failing to object. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

    3.    *Appellate Counsel*

Petitioner also contends that appellate counsel was ineffective for failing to raise his post conviction motion claims on direct appeal. To demonstrate prejudice resulting from appellate counsel's failure to raise an issue on appeal, petitioner must show that the omitted claim would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). As explained above, petitioner's underlying trial counsel claims are without merit, and petitioner therefore cannot show that counsel was ineffective for failing to raise the claims on direct appeal. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

J.    *Recommendation Regarding Certificate of Appealability*

    1.    *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*,

529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.      *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability, for the reasons explained above. Petitioner's *Batson* claim relating to his own use of peremptory challenges is squarely foreclosed by *Rivera v. Illinois*, and thus the resolution of this claim is not reasonably debatable. Likewise, in light of the deference owed a trial court's assessment of whether a defendant has established a *prima facie* case of discrimination under *Batson* and petitioner's failure to offer any evidence of discrimination other than unadorned numbers, the resolution of petitioner's *Batson* claim is not reasonably debatable. Because there is no evidence that any juror was exposed to the newspaper article reflecting the trial court's holding of Foster in contempt, and the article did not disclose any prejudicial information that the jury had not witnessed in court, the resolution of petitioner's extraneous influence claim is not reasonable debatable. The resolution of petitioner's confrontation claim is not debatable in light of the fact that petitioner was fully able to explore Gilmore's conversations with petitioner, the resolution of his *res gestae* claim is not debatable because it is not cognizable and does not assert a valid claim for a denial of compulsory process, and the resolution of his prior statement claim is not reasonable debatable because the evidence was properly admitted as substantive evidence under Rule 801(d). Likewise, the resolution of petitioner's confession claim is not reasonably debatable, in light of the fact that the confession was voluntary under the officers' version of events, and the trial court's credibility findings are presumed correct. Finally, the resolution of petitioner's ineffective assistance claims is not reasonably debatable, for the reasons explained above. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

K.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of

petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III. NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 6/15/10

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and  by electronic means or U.S. Mail on June 15, 2010.

s/Eddrey Butts
Case Manager